**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| TYLER MORRISON<br>4217 SKYVIEW<br>BALTIMORE, MD 21211<br><br>*on his own behalf and on behalf of*<br>*all others similarly situated,*<br><br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.<br>1455 MARKET STREET<br>SAN FRANCISCO, CA 94103<br><br>        Serve on:<br>        The Corporation Trust, Inc.<br>        2405 York Road, Suite 201<br>        Timonium, MD 21093<br><br>UBER USA, LLC<br>1455 MARKET STREET<br>SAN FRANCISCO, CA 94103<br><br>        Serve on:<br>        The Corporation Trust, Inc.<br>        2405 York Road, Suite 201<br>        Timonium, MD 21093<br><br>        Defendants. | **JURY TRIAL DEMANDED**<br><br><br><br><br><br>**CASE NO. _____** |

## CLASS ACTION COMPLAINT

Plaintiff Tyler Morrison ("Named Plaintiff"), on his own behalf and on behalf of all

others similarly situated, through his attorneys, Cory L. Zajdel, Esq., David M. Trojanowski,

Esq., Jeffrey C. Toppe, Esq., and Z LAW, LLC, hereby submit this Class Action Complaint

against Defendant Uber Technologies, Inc. and Uber USA, LLC (collectively "Uber") and for support states as follows:

## I.     **PRELIMINARY STATEMENT**

1.      In 2016, Uber experienced one of the largest data security breaches in history (the "Uber Data Breach").

2.      Hackers stole the personal information of approximately 25.6 million Americans ("Affected Individuals"), and approximately 57 million customers in the world in the Uber Data Breach.

3.      Despite the fact that Uber was storing sensitive personal information that it knew it was valuable to, and vulnerable to, cyberattacks and hacks, Uber failed to take even the most basic security precautions that could have protected Affected Individuals' personal data.

4.      Stealing this much data takes time, and there were numerous steps along the way when any company following standard IT security practices would have blocked the hackers.

5.      Uber failed to take these basic precautions.

6.      Uber placed the personal information of over 57 million customers in a single database (the "Uber Database").   The Uber Database included information which requires companies to take security measures to protect: names, dates of birth, home addresses, e-mail addresses, phone numbers, payment card information, location history (with precise geolocation information), bank account numbers (including domestic routing and bank account numbers), driver's license number, mobile phone number, and social security ("PII").

7.      This data and all of the PII should have received extra protection, not substandard protection.

8.      More than a year after the Uber Data Breach, on November 21, 2017, Uber disclosed that it had experienced a data breach of over 57 million Uber customers, and that Uber had knowledge of the Uber Data Breach since 2016.

9.      The information stolen in the Uber Data Breach included full names, driver's license numbers, e-mail addresses, mobile phone numbers, credit card numbers, social security numbers, and dates of birth.

10.      Named Plaintiff, both individually and on behalf of those similarly situated persons (hereafter "Class Members"), brings this Class Action to secure redress against Uber for their reckless and negligent violations of customer privacy rights.

11.      Named Plaintiff and Class Members are current and former customers who entrusted Uber with their PII.

12.      As a result of Uber's wrongful actions and inactions, Affected Individuals' information was stolen.

13.      Affected Individuals who booked rides have had their PII compromised, have had their privacy rights violated, have been exposed to the risk of fraud and identify theft, and have otherwise suffered damages.

14.      Uber did not lock any accounts or notify any of the Affected Individuals to change passwords at anytime at or around the time of the Uber Data Breach.

## II.    **JURISDICTION**

15.      This Court has subject matter jurisdiction over the state law claims asserted here pursuant to the *Class Action Fairness Act of 2005*, 28 U.S.C. § 1332(d)(2), since some of the Class Members are citizens of a State different from the Defendant and, upon the original filing of this complaint, members of the putative class reside in states around

the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million.

16.     The Court also has personal jurisdiction over the parties because Uber conducts regular and continuous business activity in Maryland.

17.     Venue is appropriate because Plaintiff is a resident and citizen of this District, the Defendant directed their activities at residents in this District, and the acts and omissions that give rise to this Action took place, among others, in this District.

## III.    PARTIES

18.     Named Plaintiff is a natural person currently residing at 4217 Skyview,

Baltimore, MD 21211.

19.     Defendant Uber Technologies, Inc. is a Delaware corporation doing business within this state and with its principal place of business located at 1455 Market Street, San Francisco, CA 94103.

20.     Defendant Uber USA, LLC is a Delaware limited liability company doing business within this state and with its principal lace of business located at 1455 Market Street, San Francisco, CA 94103.

## IV.    FACTUAL ALLEGATIONS

### A.    *The Uber Data Breach Unravels*

21.     In January 2016, the New York attorney general fined Uber $20,000 for failing to promptly disclose a data breach from 2014.

22.     Uber agreed to enhance its data security practices.   *See* A.G. Schneiderman Announces Settlement with Uber to Enhance Rider Privacy (attached hereto as **Exhibit A**).

23.    In October 2016, Uber was in the process of negotiating an agreement with the Federal Trade Commission ("FTC") related to its lax security practices in the 2014 data breach. *See* FTC Complaint (attached hereto as **Exhibit B**); FTC Decision (attached hereto as **Exhibit C**).

24.    Around the same time in October 2016, hackers gained access to the Uber Database and proceeded to download all of the PII contained in the Uber Database.

25.    In November 2016, hackers e-mailed Uber demanding a ransom in exchange for deleting the downloaded PII.

26.    U b e r  paid one hundred thousand dollars ($100,000.00) in exchange for keeping the Uber Data Breach a secret.

27.    In addition, Uber expected the hackers to delete the downloaded PII.

28.    On November 21, 2017, Uber's CEO, Dara Khosrowshahi disclosed that "I recently learned that in late 2016 we became aware that two individuals outside the company had inappropriately accessed user data stored on a third-party cloud-based service that we use."  2016 Data Security Incident, *available* at: https://www.uber.com/newsroom/2016-data-incident (last visited Apr. 10, 2019).

29.    This disclosure was made more than a year after the Uber Data Breach.

30.    Uber was aware and recognized that Affected Individuals rely on Uber to properly safeguard their PII.

31.    As stated by Uber, "[w]hen you use Uber, you trust us with your information. We are committed to keeping that trust."

32.    In addition to such representation, Uber also makes the representation that "[w]e work around the clock to protect your data from fraud, abuse, and unauthorized access."  Uber Privacy Policy, *available* at: https://privacy.uber.com/policy/ (last visited Apr. 10, 2019).

33.     According to Uber: "How does Uber protect the information it collects? We take the security of your data seriously. Uber uses technical safeguards like encryption, authentication, fraud detection, and secure software development to protect your information.  We also have an extensive team of data security and privacy experts working around the clock to prevent theft, fraud, or abuse of your information."

34.     Contrary to Uber's representation, once Uber became aware of the Uber Data Breach in November 2016, it still failed to inform Affected Individuals and the public until a year had already passed.

35.     Since the Uber Data Breach, Named Plaintiff has received scam calls which mention his PII.

36.     Uber has not disclosed more details about the Uber Data Breach.

37.     Affected Individuals, including Named Plaintiff and Class Members, paid substantial premiums for Uber services and trusted Uber with their PII.

**B.     *Stolen Information is Valuable to Hackers and Thieves***

38.     It is well known, and the subject of many media reports, that PII is highly coveted and a frequent target of hackers.

39.     Especially in the technology industry, the issue of data security and threats thereto, is well known.

40.     Despite well-publicized litigation and frequent public announcements of data breaches, Uber opted to maintain an insufficient and inadequate system to protect the PII of Named Plaintiff and Class Members.

41.     Uber negligently and recklessly put Named Plaintiff's and Class Members' PII at risk and the PII, on information and belief, was actually stolen.

42.     Legitimate organizations and criminal underground alike recognize the value of

PII.  Otherwise, they would not aggressively seek or pay for it.

43.     As previously seen in one of the world's largest data breaches, hackers compromised the card holder data of 40 million customers.  *See* "Target: 40 million credit cards compromised," CNN 1 Money, Dec. 19, 2013, *available* at http://money.cnn.com/2013/12/18/news/companies/target-credit-card/*.*

44.     Credit or debit card information is highly valuable to hackers. Credit and debit card information that is stolen from the point of sale are known as "dumps."  *See* Krebs on Security April 16, 2016, Blog Post, *available at*  https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/.

45.     Credit and debit card dumps can be sold in the cybercrime underground for a retail value of about "$20 apiece." *Id.*

46.     This information can also be used to clone a debit or credit card. *Id.*

**C.     *The Uber Data Breach Has and Will Result in Additional Identity Theft/Fraud***

47.     Uber failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the data breach.

48.     The ramification of Uber's failure to keep Named Plaintiff and Class Members' data secure is severe.

49.     Security flaws and other infirmities were explicitly outlined by Visa, as early as 2009, when it issued a Data Security Alert outlining the threat of RAM scraper malware.  The report instructs  companies to "[s]ecure remote access connectivity," "[i]mplement a secure network configuration, including egress and ingress filtering to only allow the ports/services necessary to conduct business" (*i.e.*,  segregate  networks), "actively monitor logs of network components, including IDS [intrusion detection systems] and firewalls for suspicious traffic, particularly outbound traffic to unknown addresses," "[e]ncrypt cardholder data anywhere it is

being stored and [] implement[] a data field encryption solution to directly address cardholder data in transit" and "[w]ork with your payment application vendor to ensure security controls are in place to prevent unauthorized modification to the payment application configuration."

50.     All merchants that accept customer payments via payment cards, including Uber, are obligated and required to comply with the Payment Card Industry Data Security Standards (the "PCI DSS"). *Maintaining Payment Security*, *Payment Card Industry Security Standards*, *available* at*:* https://www.pcisecuritystandards.org/pci_security/maintaining_payment_security (last visited Apr. 9, 2019) (stating "[i]f you accept or process payment cards, the PCI Data Security Standards apply to you.").

51.     Compliance with the PCI DSS is common practice in the retail industry. The PCI DSS, among other things, mandates merchants to protect cardholder data, PCI DSS v. 3.0 at 34 (Nov. 2013), requires merchants to install and maintain firewalls, *id.* at 19, forbids merchants from using default settings and passwords for applications and devices, *id.* at 28, requires merchants to segment cardholder data, *id.* at 61, and requires merchants to identify and authenticate their system users. *Id.* at 64.

52.     Additionally, sub-requirement 3.2 of the PCI DSS requires merchants and other organizations involved in payment card transactions to refrain from storing sensitive authentication data after authorization (even if it is encrypted). *See id.* at 35. To adhere to the PCI DSS, a merchant must, *inter alia*:

> First, **Assess** -- identify cardholder data, take an inventory of your IT assets and business processes for payment card processing, and analyze them for vulnerabilities that could expose cardholder data. Second, **Remediate** -- fix vulnerabilities and do not store cardholder data unless you need it. Third, **Report** -- compile and submit required remediation validation records (if applicable), and submit compliance reports to the acquiring bank and card brands you do business with.

*How to Be Compliant: Getting Started with PCI Data Security Standard Compliance*, PCI SSC, *available at* https://www.pcisecuritystandards.org/merchants/how_to_be_compliant.php (last visited Apr. 9, 2019) (emphasis in original).

53.    According to Javelin Strategy and Research, "one in every three people who is notified of being a potential fraud victim becomes one . . . with 46% of consumers who had cards breached becoming fraud victims that same year."  "Someone Became an Identity Theft Victim Every 2 Seconds Last Year," Fox Business, Feb. 5, 2014 *available* at http://www.foxbusiness.com/personal-finance/2014/02/05/someone-became-identitytheft-victim-every-2-seconds-last-year.html.

54.    It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again.

55.    On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems." *See* "Victims of Identity Theft," U.S. Department of Justice, Dec 2013, *available at* https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited Apr. 9, 2019).  In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id.* at 11.

**D.    *Annual Monetary Losses From Identity Theft Are in the Billions of Dollars***

56.    Javelin Strategy and Research reports that those losses increased to $21 billion in 2013.  *See* 2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters, *available* at: https://www.javelinstrategy.com/coverage-area/2013-identity-fraud-report-data-

breaches-becoming-treasure-trove-fraudsters (last visited Apr. 9, 2019). There may be a time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.
>
> As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

GAO, Report to Congressional Requesters, at 33 (June 2007), *available* at http://www.gao.gov/new.items/d07737.pdf.

57. Affected Individuals now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

58. Affected Individuals are incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies.

**E.    *Affected Individuals Suffered Damages***

59. The Uber Data Breach was a direct and proximate result of Uber's failure to properly safeguard and protect Affected Individuals' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Uber's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Affected Individuals' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

60.    Affected Individuals' PII is private and sensitive in nature and was inadequately protected by Uber.

61.    Uber did not obtain Affected Individuals' consent to disclose their PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

62.    As a direct and proximate result of Uber's wrongful action and inaction and the resulting Uber Data Breach, Affected Individuals have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring their credit reports and accounts for unauthorized activity.

63.    As a result of the U b e r  D a t a  B r e a c h , Affected Individuals ' debit cards and credit cards were exposed and subjected to unauthorized charges; their bank accounts were overdrawn and credit limits exceeded; they were deprived of the use of their cards and access to their funds; their preauthorized charge relationships were disrupted; they were required to expend time, energy and expense to address  and resolve these financial disruptions and mitigate the consequences; and they suffered consequent emotional distress and their credit and debit card information is at an increased risk of theft and unauthorized use.

64.    Affected Individuals were deprived of use of their credit and debit cards for appreciable periods of time and were unable to access their accounts or their funds; lost accumulated miles and points toward bonus awards and were unable to earn points during the interval their cards were inactivated; were required to pay fees to issuing banks for replacement cards; were required to cancel and change their registered numbers with online sellers; were required to

change the pre-authorizations; were placed in non-payment status by virtue of their cards being overdrawn or abruptly cancelled and were required to pay penalties and service reinstatement fees; purchased identity theft insurance and credit monitoring services to protect themselves against possible consequences of the breach; suffered emotional distress as they were forced to cope with the unauthorized charges and other consequences of the Uber Data Breach and were still not aware of the Uber Data Breach or that their PII was compromised.

65.    Some Affected Individuals did not cancel their debit and credit cards and continue to experience fraudulent activity on their accounts.

66.    Uber's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Affected Individuals' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    Theft of their PII, including on information and belief, actual theft of credit/debit card numbers;

b.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and already misused via the sale of Affected Individuals' PII on the Internet black market;

c.    The untimely and inadequate notification of the Uber Data Breach;

d.    The improper disclosure of Affected Individuals' PII;

e.    Loss of privacy;

f.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

g.    Ascertainable losses in the form of deprivation of the value of their PII,

for which there is a well-established national and international market;

        h.     Overpayments to Uber for booking rides and fees during the Uber Data Breach in that a portion of the price paid for such use by Affected Individuals to Uber was for the costs of reasonable and adequate safeguards and security measures that would protect customers' PII, which Uber and its affiliates did not implement and, as a result, Affected Individuals did not receive what they paid for and were overcharged by Uber; and

        i.     Deprivation of rights under the Unfair Competition Laws.

## V.    <u>CLASS ACTION ALLEGATIONS</u>

67.    Named Plaintiff brings this action on their own behalf and pursuant to the FEDERAL RULES OF CIVIL PROCEDURE 23(b)(2) and (b)(3).

68.    Named Plaintiff seeks certification of a Nationwide Class, a California Sub-Class, and a Maryland Sub-Class. The Nationwide Class ("Nationwide Class") consists of:

> **All persons residing in the United States, including the District of Columbia, whose PII was disclosed in the Uber Data Breach.**

The California Sub-Class ("California Class") consists of:

> **All persons residing in California whose PII was disclosed in the Uber Data Breach.**

The Maryland Sub-Class ("Maryland Class") consists of:

> **All persons residing in Maryland whose PII was disclosed in the Uber Data Breach.**

69.    Excluded from each of the above Classes are those individuals: (a) who now are or have ever been executives of the Defendant and the spouses, parents, siblings, and children of all such individuals.

70.    The Classes, as defined above, are identifiable. Named Plaintiff is a member of the Classes.

71.    The Classes consists, at a minimum, of twenty five million (25,000,000) individuals and are thus so numerous that joinder of all members is clearly impracticable.

72.    There are questions of law and fact which are not only common to the Classes but which predominate over any questions affecting only individual Class Members.

73.    The common and predominating questions include, but are not limited to:

    a)    Whether Uber owed a duty of care to Affected Individuals with respect to the security of their personal information;

    b)    Whether Uber took reasonable steps and measures to safeguard Affected Individuals' PII;

    c)    Whether Uber violated common and statutory law by failing to promptly notify Affected Individuals their PII was compromised;

    d)    Whether Uber has an implied contractual obligation to use reasonable security measures;

    e)    Whether Uber complied with any implied contractual obligation to use reasonable security measures;

    f)    Whether Uber's acts and omissions described herein give rise to a claim of negligence;

    g)    Whether Uber knew or should have known of the Uber Data Breach prior to its November 2017 disclosure;

    h)    Whether Uber had a duty to promptly notify Affected Individuals that their PII was, or potentially could be, compromised;

    i)    What security measures, if any, must be implemented by Uber to comply with its implied contractual obligations;

j)   Whether Affected Individuals are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

74.    Claims of Named Plaintiff are typical of the claims of the respective members of the Classes and are based on and arise out of similar facts constituting the wrongful conduct of Uber.

75.    Named Plaintiff will fairly and adequately protect the interests of the Class Members.

76.    Named Plaintiff is committed to vigorously litigating this matter.

77.    Further, Named Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

78.    Neither Named Plaintiff, nor their counsel, have any interests which might cause them not to vigorously pursue this claim.

79.    Common questions of law and fact enumerated above predominate over questions affecting only individual members of the Classes.

80.    A class action is the superior method for fair and efficient adjudication of the controversy.

81.    The likelihood that individual members of the Classes will prosecute separate actions in court is remote due to the time and expense necessary to conduct such litigation.

82.    Counsel for Named Plaintiff and the Classes are experienced in class actions and foresee little difficulty in the management of this case as a class action.

## VI.    CAUSES OF ACTION

### COUNT ONE
### BREACH OF IMPLIED CONTRACT
#### (On behalf of the Nationwide Class)

83.    Named Plaintiff incorporates by reference all of the allegations herein as if each and every allegation is set forth fully herein.

84.    Uber's system solicited and invited Affected Individuals to create accounts and book rides, and for drivers to drive customers. Affected Individuals accepted Uber's offers by creating accounts, booking rides and driving riders booked through Uber.

85.    When Affected Individuals created accounts and booked rides through Uber, they provided their PII.

86.    In so doing, Affected Individuals entered into implied contracts with Uber to which Uber agreed to safeguard and protect such information and to timely and accurately notify Affected Individuals if their data had been breached and compromised.

87.    Each account created and booking made with Uber's system by Affected Individuals was made pursuant to the mutually agreed-upon implied contract with Uber and the drivers using their system under which Uber agreed to safeguard and protect Affected Individuals' PII and to timely and accurately notify them if such information was compromised or stolen.

88.    Affected Individuals would not have provided and entrusted their PII to Uber in the absence of the implied contract between them and Uber.

89.    Affected Individuals fully performed their obligations under the implied contracts with Uber.

90.    Uber breached the implied contracts it made with Affected Individuals by failing to safeguard and protect the PII of Affected Individuals and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Uber Data Breach.

91.     As a direct and proximate result of Uber's breaches of the implied contracts between Uber and Affected Individuals, Affected Individuals sustained actual losses and damages as described in detail above.

## COUNT TWO
## NEGLIGENCE
### (On behalf of the Nationwide Class)

92.     Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

93.     A special relationship exists between Uber and Affected Individuals.

94.     U b e r actively solicited Affected Individuals to create accounts and use their PII in sales transactions on Uber's app.

95.     When Affected Individuals gave their PII to Uber to create an account and/or facilitate and close sales transactions, they did so with the mutual understanding that U b e r had reasonable security measures in place and Uber would take reasonable steps to protect and safeguard the PII of Affected Individuals. Affected Individuals also gave their PII to Uber on the premise that Uber was in a superior position to protect against the unauthorized access, theft and misuse of that information.

96.     Upon accepting Affected Individuals' PII in their respective point-of-sale systems, Uber undertook and owed a duty to Affected Individuals to exercise reasonable care to secure and safeguard that information from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties, and to utilize commercially reasonable methods to do so.

97.     This duty included, among other things, designing, maintaining, and testing Uber's security systems to ensure that Affected Individuals' PII was adequately secured and protected.

98.     Uber further had a duty to implement processes that would detect a breach of its security system in a timely manner.

99.     Uber had a duty to timely disclose to Affected Individuals that their PII had been or was reasonably believed to have been compromised.  Timely disclosure was appropriate so that, among other things, Affected Individuals could take appropriate measures to avoid use of bank funds, and monitor their account information and credit reports for fraudulent activity.

100.     Uber breached its duty to discover and to notify Affected Individuals of the unauthorized access by failing to discover the security breach within reasonable time and by failing to notify Affected Individuals of the breach until November 2017.

101.     To date, Uber has not provided sufficient information to Affected Individuals regarding the extent and scope of the unauthorized access and continues to breach its disclosure obligations to Affected Individuals.

102.     Uber also breached its duty to Affected Individuals to adequately protect and safeguard this information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII.

103.     Furthering its negligent practices, Uber failed to provide adequate supervision and oversight of the PII with which it is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a third party to gather Affected Individuals' PII, misuse the PII, and intentionally disclose it to others without consent.

104.     Through Uber's acts and omissions described in this Complaint, including Uber's failure to provide adequate security and its failure to protect Affected Individuals' PII from being foreseeably captured, accessed, disseminated, stolen, and misused, Uber unlawfully breached its duty to use reasonable care to adequately protect and secure Affected Individuals' PII during the time it was within Uber's control.

105.    Further, through its failure to timely discover and provide clear notification of the Uber Data Breach to Affected Individuals, Uber prevented Affected Individuals from taking meaningful, proactive steps to secure their PII.

106.    Upon information and belief, Uber improperly and inadequately safeguarded the PII of Affected Individuals in deviation from standard industry rules, regulations, and practices at the time of the Uber Data Breach.

107.    Uber's failure to take proper security measures to protect Affected Individuals' sensitive PII as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Affected Individuals' PII.

108.    Uber's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the PII; failing to conduct adequate regular security audits; failing to provide adequate and appropriate supervision of persons having access to Affected Individuals' PII.

109.    Affected Individuals did not contribute to the Uber Data Breach and subsequent misuse of their PII as described in this Complaint.

110.    As a direct and proximate result of Uber's negligence, Affected Individuals sustained actual losses and damages as described in detail above.

## COUNT THREE
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES
### (On behalf of the Nationwide Class)

111.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

112.    Named Plaintiff brings this Count for violation of the respective statutory consumer protection laws, as follows:

    a.    Alabama Deceptive Trade Practices Act, Ala. Code 1975, § 8–19–1, *et seq*;

b.   Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, *et seq*;

c.   Arizona Consumer Fraud Act, A.R.S §§ 44-1521, *et seq*;

d.   Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101, *et seq*;

e.   Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq*;

f.   Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq*;

g.   Delaware Consumer Fraud Act, 6 Del. C. § 2513, *et seq*;

h.   D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq*;

i.   Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, *et seq*;

j.   Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq*;

k.   Hawaii Unfair Competition Law, H.R.S. § 480-1, *et seq*;

l.   Idaho Consumer Protection Act, I.C. § 48-601, *et seq*;

m.   Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1 *et seq*;

n.   Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq*;

o.   Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, *et seq*;

p.   Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq*;

q.   Kentucky Consumer Protection Act, KRS 367.110, *et seq*;

r.   Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq*.;

s.   Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq*;

t.   Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq*;

u.   Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq*;

v.   Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq*;

w.   Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq*;

x.   Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24- 1, *et seq*;

y.   Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq*;

z.   Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq*;

aa.  Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq*;

bb.  Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq*;

cc.  New Hampshire Regulation of Business Practices for Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq*;

dd.  New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq*;

ee.  New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, *et seq*;

ff.  New York Consumer Protection from Deceptive Acts and Practices, N.Y. GBL (McKinney) § 349, *et seq*;

gg.  North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq*;

hh.  North Dakota Consumer Fraud Act, N.D. Cent. Code Chapter 51-15, *et seq*;

ii.  Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq*;

jj.  Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq*;

kk.  Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq*;

ll.  Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*;

mm.    Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1- 5.2(B), *et seq*;

nn. South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq*;

oo. South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq*;

pp. Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq*;

qq. Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq*;

rr.  Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq*;

ss.  Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq*;

tt.  Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, *et seq*;

uu. Washington Consumer Protection Act, RCWA 19.86.010, *et seq*;

vv.  West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A-1-101, *et seq*;

ww. Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq*.; and;

xx. Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq*.

113.    Uber violated the statutes set forth above (collectively, the "Consumer Protection Acts") by failing to properly implement adequate, commercially reasonable security measures to protect Affected Individuals' PII, and by allowing third parties to access Affected Individuals' PII.

114.    Uber further violated the Consumer Protection Acts by failing to disclose to the Affected Individuals that its data security practices were inadequate, thus inducing Affected Individuals to schedule and book rides through Uber.

115.    Uber's acts and/or omissions constitute fraudulent, deceptive, and/or unfair acts or omissions under the Consumer Protection Acts.

116.    Affected Individuals were deceived by Uber's failure to properly implement adequate, commercially reasonable security measures to protect their PII.

117.    Uber intended for Affected Individuals to rely on Uber to protect the information furnished to it in connection with debit and credit card transactions and/or otherwise collected by

Uber, in such manner that Affected Individuals' PII would be protected, secure and not susceptible to access from unauthorized third parties.

118.     Uber instead handled Affected Individuals' information in such manner that it was compromised.

119.     Uber failed to follow industry best practices concerning data security or was negligent in preventing the Uber Data Breach from occurring.

120.     It was foreseeable that Uber's willful indifference or negligent course of conduct in handling Affected Individuals' PII it collected would put that information at the risk of compromise by data thieves.

121.     On information and belief, Uber benefited from mishandling the PII of Affected Individuals, by not taking effective measures to secure this information, and therefore saving on the cost of providing data security.

122.     Uber's fraudulent and deceptive acts and omissions were intended to induce Affected Individuals' reliance on Uber's deception that their PII was secure.

123.     Uber's conduct offends public policy and constitutes unfair acts or practices under the Consumer Protection Acts because Uber caused substantial injury to Affected Individuals that is not offset by countervailing benefits to consumers or competition, and is not reasonably avoidable by consumers.

124.     Uber's acts or practice of failing to employ reasonable and appropriate security measures to protect PII constitute violations of the Federal Trade Commission Act, 15 U.S.C. § 45(a), which the courts consider when evaluating claims under the Consumer Protection Acts, including 815 ILCS 505/2.

125.    Uber's conduct constitutes unfair acts or practices as defined in the Consumer Protection Acts because Uber caused substantial injury to Affected Individuals, which injury is not offset by countervailing benefits to consumers or competition and was not reasonably avoidable by consumers.

126.    Affected Individuals have suffered injury in fact and actual damages including lost money and property as a result of Uber's violations of the Consumer Protection Acts.

127.    Uber's fraudulent and deceptive behavior proximately caused Affected Individuals' injuries, and Uber conducted itself with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

128.    Uber's failure to disclose information concerning the Uber Data Breach directly and promptly to Affected Individuals, constitutes a separate fraudulent act or practice in violation of the Consumer Protection Acts.

129.    Named Plaintiff seeks attorney's fees and damages to the fullest extent permitted under the Consumer Protection Acts.

**COUNT FOUR**
**NEGLIGENCE PER SE**
**(On behalf of the Nationwide Class)**

130.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

131.    Pursuant to the Federal Trade Commission Act (15 U.S.C. §45), Uber had a duty to provide fair and adequate computer systems and data security practices to safeguard Affected Individuals' PII.

132.    Pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Uber had a duty to protect the security and confidentiality of Affected Individuals' PII.

133.    Pursuant to state laws in the following 12 states, Uber operating in those states had a duty to those respective states' Affected Individuals to implement and maintain reasonable security procedures and practices to safeguard Affected Individuals' PII:

    a.  Arkansas: Ark. Code § 4-110-104;
    b.  California: Cal Civ. Code § 1798.81.5;
    c.  Connecticut: Conn. Gen. Stat. § 42-471;
    d.  Florida: Fla. Stat. § 501.171(2);
    e.  Indiana: Ind. Code § 24-4.9-3.5;
    f.  Maryland: Md. Code. Comm. Law § 14-3503;
    g.  Massachusetts: Mass. Gen Laws Ch. 93H, § 3(a);
    h.  Nevada: Nev. Rev. Stat. § 603A.210;
    i.  Oregon: Ore. Rev. Stat. § 646A.622(1);
    j.  Rhode Island: R.I. Gen Laws § 11-49.2-2(2);
    k.  Texas: Tex. Bus. & Com. Code § 521.052(a);
    l.  Utah: Utah Code § 14-44-201(1)(a)

134.    Uber breached their duties to Affected Individuals under the Federal Trade Commission Act (15 U.S.C. § 45), Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the state reasonable data security statutes by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Affected Individuals' PII.

135.    Uber's failure to comply with applicable laws and regulations constitutes negligence per se.

136.    But for Uber's wrongful and negligent breach of their duties owed to Affected Individuals, Affected Individuals would not have been injured.

137.    The injury and harm suffered by Affected Individuals was the reasonably foreseeable result of Uber's breach of their duties.

138.    Uber knew or should have known that they were failing to meet their duties, and that Uber's breach would cause Affected Individuals to experience the foreseeable harms associated with the exposure of their PII.

139.    As a direct and proximate result of Uber's negligent conduct, Affected Individuals have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT FIVE**
**BREACH OF COVENANT OF GOOD FAITH**
**(On behalf of the Nationwide Class)**

140.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

141.    The law implies a covenant of good faith and fair dealing in every contract.

142.    Affected Individuals contracted with Uber by accepting Uber's offers and paying for the booking of rides.

143.    Affected Individuals performed all of the significant duties under their agreements with Uber.

144.    The conditions required for Uber's performance under the contract has occurred.

145.    Uber did not provide and/or unfairly interfered with and/or frustrated the right of Affected Individuals to receive the full benefits under their agreement.

146.    Uber breached the covenant of good faith and fair dealing implied in its contracts with Affected Individuals by failing to use and provide reasonable and industry-leading security practices.

147.    Affected Individuals were damaged by Uber's breach in that they paid for, but never received, the valuable security protections to which they were entitled, and which would have made their products and services more valuable.

**COUNT SIX**
**VIOLATION OF STATE DATA BREACH ACTS**
**(On behalf of the Nationwide Class and California Sub-Class)**

148.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

149.     Uber owns, licenses and/or maintains computerized data that includes Affected Individuals' PII.

150.     Uber was required to, but failed, to take all reasonable steps to dispose, or arrange for the disposal, of records within its custody or control containing PII when the records were no longer to be retained, by shredding, erasing, or otherwise modifying the personal information in those records to make it unreadable or undecipherable through any means.

151.     Uber's conduct, as alleged above, violated the data breach statutes of many states, including:

   a.   California, Cal. Civ. Code §§ 1798.80 *et. seq*;
   b.   Hawaii, Haw. Rev. Stat. § 487N-1–4 (2006);
   c.   Illinois, 815 Ill. Comp Stat. Ann. 530/1–/30 (2006);
   d.   Louisiana, La. Rev. Stat. § 51:3071-3077 (2005), and L.A.C. 16:III.701;
   e.   Michigan, Mich. Comp. Laws Ann. §§ 445.63, 445.65, 445.72 (2006);
   f.   New Hampshire, N.H. Rev. Stat. Ann. §§ 359-C:19–C:21, 358- A:4 (2006)., 332-I:1–I:610;
   g.   New Jersey, N.J. Stat. Ann. § 56:8-163–66 (2005);
   h.   North Carolina, N.C. Gen. Stat. §§ 75-65 (2005); as amended (2009);
   i.   Oregon, Or. Rev. Stat. §§ 646A.602, 646A.604, 646A.624 (2011);
   j.   South Carolina, S.C. Code § 1-11-490 (2008); S.C. Code § 39-1- 90 (2009);
   k.   Virginia, Va. Code Ann. § 18.2-186.6 (2008); Va. Code Ann. § 32.1– 127.1:05 (2011);
   l.   District of Columbia, D.C. Code § 28-3851 to 28-3853 (2007) (collectively, the "State Data Breach Acts").

152.     Uber was required to, but failed, to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Uber Data Breach.

153.     The Uber Data Breach constituted a "breach of the security system" within the meaning of section 1798.82(g) of the California Civil Code, and other State Data Breach Acts.

154.    The information compromised in the Data Breach constituted "personal information" within the meaning of section 1798.80(e) of the California Civil Code, and other State Data Breach Acts.

155.    Like other State Data Breach Acts, California Civil Code § 1798.82(a) requires disclosure of data breaches "in the most expedient time possible and without unreasonable delay[.]"

156.    Uber violated Cal. Civ. Code § 1798.82(a) and other State Data Breach Acts by unreasonably delaying disclosure of the Uber Data Breach to Affected Individuals whose PII was, or was reasonably believed to have been, acquired by an unauthorized person.

157.    Upon information and belief, no law enforcement agency instructed Uber that notification to Affected Individuals would impede a criminal investigation.

158.    As a result of Uber's violation of State Data Breach Acts, including Cal. Civ. Code § 1798.80, *et seq*., Affected Individuals incurred economic damages, including expenses associated with monitoring their personal and financial information to prevent further fraud.

159.    Named Plaintiff, individually and on behalf of the Class, seeks all remedies available under Cal. Civ. Code § 1798.84 and under the other State Data Breach Acts, including, but not limited to: (a) actual damages suffered by Affected Individuals; (b) statutory damages for Uber's willful, intentional, and/or reckless violations; (c) equitable relief; and (d) reasonable attorneys' fees and costs.

160.    Because Uber was guilty of oppression, fraud or malice, in that it failed to act with a willful and conscious disregard of Affected Individuals' rights, Named Plaintiff also seeks punitive damages.

**COUNT SEVEN**
**VIOLATION OF MARYLAND PERSONAL INFORMATION PROTECTION ACT**
**(On behalf of the Maryland Sub-Class)**

161.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further allege:

162.    MD. CODE ANN., COMM. LAW § 14-3504(b)(1) provides: "A business that owns or licenses computerized data that includes personal information of [a Maryland resident], when it discovers or is notified of a breach of the security of a system, shall conduct in good faith a reasonable and prompt investigation to determine the likelihood that personal information of the individual has been or will be misused as a result of the breach."

163.    MD. CODE ANN., COMM. LAW § 14-3504(b)(2) provides that "[i]f, after the investigation is concluded, the business determines that the breach of the security of the system creates a likelihood that personal information has been or will be misused, the business shall notify the individual of the breach."

164.    MD. CODE ANN., COMM. LAW § 14-3504 (b)(3) further provides that the notification required "shall be given as soon as reasonably practicable, but not later than 45 days after the business concludes the investigation[.]"

165.    As described above, Uber waited over one year to notify the Affected Individuals about the Uber Data Breach.

166.    As a result of Uber's violation of the *Maryland Personal Information Protection Act*, Affected Individuals that reside in Maryland are entitled to damages and attorney's fees as provided for pursuant to MD. CODE ANN., COMM. LAW § 14-3508 and MD. CODE ANN., COMM. LAW § 13-408.

**COUNT EIGHT**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. &**
**PROF. CODE  17200 UNLAWFUL BUSINESS PRACTICES**
**(On behalf of the California Class)**

167.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

168.    Uber engaged in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code §17200.

169.    Uber engaged in unlawful acts and practices with respect to its services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Affected Individuals' PII with knowledge that the information would not be adequately protected; and by gathering Affected Individuals' PII in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Uber to take reasonable methods of safeguarding Affected Individuals' PII.

170.    In addition, Uber engaged in unlawful acts and practices with respect to its services by failing to discover and then disclose the Uber Data Breach to Affected Individuals in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

171.    To date, Uber has still not provided such sufficient information to Affected Individuals.

172.    As a direct and proximate result of Uber's unlawful acts and practices, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

173.    Uber knew or should have known that its system had been breached and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

174.    Uber's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

175.    Affected Individuals seek relief under Cal. Bus. & Prof. Code § 17200, *et. seq*., including, but not limited to, restitution to Affected Individuals of money or property that Uber may have acquired by means of its unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Uber because of its unlawful and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

### COUNT NINE
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE  17200 UNLAWFUL BUSINESS PRACTICES
### (On behalf of the California Class)

176.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

177.    Uber engaged in unfair acts and practices by soliciting and collecting Affected Individuals' PII with knowledge that the information would not be adequately protected; while Affected Individuals' PII would be processed in an unsecure electronic environment.

178.    These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Affected Individuals.

179.    The unfair acts and practices were likely to deceive the public into believing their PII was secure, when it was not.

180.    The harm these practices caused to Affected Individuals outweighed their utility, if any.

181.    Uber engaged in unfair acts and practices with respect to the provision of its services by failing to enact adequate privacy and security measures and protect Affected Individuals' PII from further unauthorized disclosure, release, data breaches, and theft, and failing to timely discovery and give notice of the Uber Data Breach.

182.    As a direct and proximate result of Uber's unfair practices and acts, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

183.    Uber knew or should have known that its systems and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

184.    Uber's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

### COUNT TEN
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE  17200 FRAUDULENT/DECEPTIVE BUSINESS PRACTICES
### (On behalf of the California Class)

185.    Named Plaintiff re-alleges and incorporates by reference the allegations set forth herein, and further alleges:

186.    Uber engaged in fraudulent and deceptive acts and practices by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard the Affected Individuals' PII from unauthorized disclosure, release, data breaches, and

theft; and representing and advertising that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Affected Individuals' PII. These representations were likely to deceive members of the public, including Affected Individuals, into believing their PII was securely stored, when it was not, and that Uber was complying with relevant law, when it was not.

187.    Uber engaged in fraudulent and deceptive acts and practices by omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Affected Individuals' PII. At the time that Affected Individuals were creating accounts and booking rides through Uber's system, Uber failed to disclose to Affected Individuals that its data security systems failed to meet legal and industry standards for the protection of their PII.

188.    Affected Individuals would not have created accounts or booked rides with Uber if they had known about its substandard data security practices.

189.    These representations were likely to deceive members of the public, including Affected Individuals, into believing their PII was secure, when it was not, and that Uber was complying with relevant law and industry standards, when it was not.

190.    As a direct and proximate result of Uber's deceptive practices and acts, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

191.    Uber knew or should have known that its system and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

192.    Uber's actions in engaging in the abovenamed unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

193.    Class Members seek relief under Cal. Bus. & Prof. Code § 17200, *et. seq*., including, but not limited to, restitution to Affected Individuals of money or property that Uber may have acquired by means of its fraudulent and deceptive business practices, restitutionary disgorgement of all profits accruing to Uber because of its fraudulent and deceptive business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

### COUNT ELEVEN
### CONSTITUTIONAL INVASION OF PRIVACY
### (On behalf of the California Class)

194.    Named Plaintiff re-alleges and incorporate by reference the allegations set forth herein, and further alleges:

195.    Cal. Const., Art. 1., section 1 provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

196.    Affected Individuals had a legally protected privacy interest in the PII provided to Uber.

197.    Affected Individuals had a reasonable expectation of privacy as to the PII they provided to Uber under the circumstances of their purchases.

198.    Uber's actions and inactions amounted to a serious invasion of Affected Individuals' protected privacy interests.

199.    Uber's invasion of Affected Individuals' reasonable expectation of privacy caused Affected Individuals to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff, individually and on behalf of all Affected Individuals, respectfully requests that this Court:

A.  Assume jurisdiction of this case;

B.  Enter an order certifying the Nationwide Class;

C.  Enter an order certifying the California Sub-Class;

D.  Enter an order certifying the Maryland Sub-Class;

E.  Enter an order awarding actual and compensatory damages, in an amount to be determined;

F.  Enter an order awarding costs of suit and attorneys' fees, as allowable by law;

G.  Enter an order awarding punitive damages, in an amount to be determined; and

H.  Such other and further relief as this court may deem just and proper.

Respectfully submitted,

**Z LAW, LLC**

Dated: April 29, 2019

_____/s/   28191_____
Cory L. Zajdel (Fed. Bar #28191)
David M. Trojanowski (Fed. Bar #19808)
Jeffrey C. Toppe (Fed. Bar #20804)
2345 York Road, Ste. B-13
Timonium, MD 21093
(443) 213-1977
clz@zlawmaryland.com
dmt@zlawmaryland.com
jct@zlawmaryland.com

**Attorneys for Plaintiffs**

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

_____/s/__28191_____
Cory L. Zajdel